This is an action to recover land.
The plaintiff offered in evidence a grant to Andrew McMillan for 6,000 acres of land, of date 31 January, 1853, and mesne conveyances from the said McMillan to himself.
In the deed to the plaintiff there is an exception of 200 acres, as being owned by the defendant, Duncan McPherson, which is described by metes and bounds.
The plaintiff also offered evidence locating his paper title and identifying the land therein described as the land described in the complaint.
The defendant claimed that he was the owner of 335 acres of land within the boundaries of the grant, and not 200 acres, as contended by the plaintiff, and admitted that he was in possession of the same. *Page 520 
A survey was made under order of court, and the contention of the defendant as to the location of the 335 acres is represented on the plat by the figures 1, 2, 3, 4, 5, 6, 7, 8, 9, 10, 11, 12, 13.
The greater part of the 200 acres, as shown on the plat, is within the claim of the defendant, but a part is not. The home and outbuildings of the defendant are on the 200 acres as located on the plat.
The defendant introduced a deed from Mary Gordon and others to his grandfather, John McPherson, of date 9 February, 1818, and registered in 1912, purporting to convey five tracts of land by separate descriptions, which aggregated 335 acres.
 The testimony of the defendant in his own behalf and the exceptions to the rulings during his examination are as follows:
(640) "I have heard this deed read, and am familiar with the lands described in deed Gordon to McPherson. I reckon I am. I don't reckon anything about it; I know it. I am not familiar with all the lines in these tracts; no, sir, not all of these tracts. It is all run in together, the way I understand it. This land is located at lines all around my place there. I could not tell you exactly where. It lies around my house, on the place there. I claim 335 acres. I don't understand this map. I have seen the lines run, starting at 1 to 2, 3, 4, 5, 6, 7, 8, 9, 10, 11, 12, 13, and back to 1."
Q. Are those the lines, outside lines, called for in this deed? (Plaintiff objects; objection sustained, and defendant excepts.)
Q. What lines are those? (Plaintiff objects.)
Counsel for defendant here states that he proposes to show by the witness that these lines (1 to 13 and back to 1) indicate the outside lines called for in the deed to John McPherson. (Plaintiff objects; objection sustained, and defendant excepts.)
Q. What are the lines in your deed? Point them out on that map. (Plaintiff objects; objection sustained, and defendant excepts.)
"I pointed out the lines I claim to Mr. McLean. I think this was about sixteen years ago. He gave me this map."
Q. What are the boundaries in this deed — that you claim under this deed? (Plaintiff objects; objection sustained, and defendant excepts.)
"I can go around the boundary of my land. My boundaries begin 100 yards of the old cotton house and run thence to the corner, up to Briar Branch; thence corners, and runs another straight line across to the mouth of Tars Fork. These boundaries are marked with blazes and chops. The beginning corner is on a little knoll about 50 yards of Briar Branch. Corner was there at one time, but when McLean surveyed, no corner was there then, and he hit another corner and then found the corner. It run out about a quarter of a mile of my house, on the south *Page 521 
side, and crossed Tars Fork and down the branch a quarter of a mile, and crossed it again, and come back inside the edge of my old field. It went nearly a quarter of a mile altogether, and came to a corner. A lightwood knot stuck down in the ground indicates my corner. I don't know how long it has been in the ground, but it has been a good while — twenty-five (641) or thirty years — I don't know exactly how long. I was at home the last day McLean surveyed the land. He surveyed it two or three times. I was with him when he surveyed it the last time. I did not point out to him the lines to survey. He surveyed by nothing that I could see. He did not survey the lines I had previously pointed out to him as my contentions."
Q. Point out to the jury what lands you have been claiming or been in possession of. (Plaintiff objects; objection sustained, and defendant excepts.)
Q. Of the lands that you have just described a little bit ago, where your lines run, what use have you been making of those lands? (Objection by plaintiff; objection sustained; defendant excepts.)
"My house is within the boundary of that deed. I live on the 100-acre tract, in the southwest corner of the square 200 acres. Besides this lightwood knot that I spoke of, there are some blazes on a tree. I don't know exactly how many blazes, but blazes and chops. I don't think there is any marked tree around the beginning corner. I don't think any tree is close to the beginning corner. I don't know that I can describe the lines around those tracts that I have seen — tell how any one can distinguish them and find them. It starts at foot of Briar Branch and runs — I don't know exactly how far — to a corner, and turns and goes in that direction. There are pines, blackjack pointers, and lightwood stobs, blazed and chopped, three chops on them. The next line is blazed and chopped; has a lightwood knot corner, a little pine and a little blackjack pointer; they are chopped three chops. The next line is a little more than one-half mile long. It is marked in chops, and about halfway on that line is an old corner, and there is another light-wood knot there and some chopped trees. I don't think but two chopped trees, one on each side on a straight line. The next line, chops and blazes. Then you strike Martin McPherson's land. Last line is not marked at all; it lapses. There it strikes another corner and a dead pine, and lightwood knot is struck up there. Nothing else, only blackjack pointers. Next line comes on back towards the beginning corner; one lightwood knot struck up there, about halfway to the beginning corner. I don't know how long I've been in possession of that land — I reckon you call in possession — ever since I (642) was big enough. Me and my father lived there. I have lived there sixty-five *Page 522 
years. I have planted it in corn, cotton, worked it in turpentine, and cut cross-ties on it. I farmed on it ever since I was big enough to farm. I worked turpentine about four years. That has been thirty-five years ago, I reckon. I have been farming on it, working turpentine and cutting crossties, all I could, on it. I have been doing all that. That has been going on between forty and fifty years. No one else has been in possession besides me. I don't know exactly how long it was the first time I saw the land in this deed survey. Thomas Gibson surveyed it. I was a boy at the time, and don't recollect exactly what surveying he was doing. He surveyed mine and my father's lands around there; surveyed the entire tract of 335 acres."
Q. How did he mark it as he surveyed this land? (Objection by plaintiff.)
Defendant's counsel here states that he proposes to show by the witness that Thomas Gibson, the surveyor, had the lines marked by chopping the trees along same and blazing the line trees, and establishing corners at the time of his survey, covering the lands now in dispute. (Plaintiff objects; objection sustained, and defendant excepts).
"I have built two houses on the land — first one about fifteen years ago; then there is the old one that has been there twenty or twenty-five years. My father built six houses on the land; they were not all rental houses; they were cribs. I declare I don't know how much I have cleared. I suppose about 200 acres of it altogether, by grandpa, father, and myself. I don't know what grandpa did, only what they told me. The reason I didn't carry my deed to McLean the last time he surveyed was because he didn't ask me for it; he had it before, and I thought that was enough. I have exercised possession half-mile one course, 300 yards another course. I stopped where my lines were. I worked on it to where it was marked to the west side; then there was a branch or creek. I have been in possession ever since my father died, and my (643) father before then, up to these line I have described. My father died 17 September, 1880. His name was Duncan McPherson, same as mine. I do not know who put the marks on my lines. The blazed trees were different sizes, some good-sized pines and some little ones. I couldn't tell exactly how old they are. I was with McLean a part of the time when he surveyed the square 200 acres. He ran through my land two or three times before he got it straight. I do not know exactly where those boundaries are. I was with him when he run some of the lines. I don't know how many lines. I was on one of the lines, I'm sure. He started in surveying the 200 acres at the southwest corner, and run due north, then due east, then south, then back to the beginning. I was with him a part of the time of the first line, but *Page 523 
don't think I was with him at all on the second line. Was on the south line part of the time, and a part on the closing-up line. I know where those lines are. This square 200 acres does not include all the cleared land, and some inside of it is not cleared. The cleared part outside of the 200 acres is on the west side. I expect it was turned out fifty years ago. I had it boxed. I don't suppose it has been cultivated in fifty years. There is some cleared, but not cultivated, outside of the 200 acres. I do not know where the pine near two pine pointers, etc., in the Gordon deed is. I know where the line `running north 50 poles to a stake' is. I have been trying to point it out the best I could on the map. I can't point it out on the map. If I was home I could point it out and show you all the corners. There are several corners called for. `Beginning at a pine near two pine pointers on the south side of a small hollow.' I don't know where the two pine pointers are, but I know where the pine is. I know about the hollow. I reckon I could come mighty nigh pointing it out on the map. The hollow is outside of this survey — not on the map. No, I guess it's inside of this plat. The 25 acres don't belong to this land at all. I don't think any other of this land is outside of the land I claim. `Beginning at a pine pointer on the south side of Big Muddy Creek' — that is all inside of this survey. I couldn't tell you whereabouts. `Running south 45 west 32 chains' is one of the lines around my land. I don't know where several of these lines are. It all runs (466) around together, and I know where these lines run around. I don't know where the various lines in these various tracts are, but I know where I thought it was, and if I was at home I could walk around it. I know, because it is marked around there. The map is not marked off so I can tell the different tracts."
His Honor, among other things, charged the jury as follows:
"There is but one view for you to decide. The question is, Is the land in question, outside of the 200-acre piece marked on the map in the square, embraced and included in the boundary in the grant and deeds coming down from that grant to the present time? The defendant claims this land under a deed to his grandfather, John McPherson, dated 1818, recorded here some time ago, under act of the Legislature, authorizing a deed of that sort to be recorded. But that act especially says that the effect of that deed shall not interfere with any vested rights. At the time that deed was recorded, if this land was embraced in the grant and deeds introduced by plaintiff, then title to that land vested in the plaintiff, and that act would not divest it," and defendant excepted.
When his Honor told the jury that the only question for them to decide was whether the grant and deeds under which the plaintiff claimed covered the land in controversy, he, in effect, withdrew the consideration of the deed under which the defendant claimed as color of title, and the evidence of adverse possession, which he had offered, and in this there was error.
It is true, it was said in Austen v. Staten, 126 N.C. 783, which was affirmed in Lindsey v. Beaman, 128 N.C. 189, that an unregistered deed is not, since the Connor Act of 1885, color of title, but in the subsequent cases of Collins v. Davis, 132 N.C. 111, and Janney v. Robbins, 141 N.C. 406, this language was restricted to grantees from (645) a common grantor.
In the Janney case, Justice Hoke, speaking for the Court, said: "In Austen v. Staten the plaintiff claimed under a deed to himself from H. W. Staten, and two others, dated 31 March, 1896, registered the same day. The defendant claimed under a deed to himself from the same parties, dated 31 December, 1887, registered 31 May, 1897. It will be noted that there both parties claimed from the same grantor, and the plaintiff's deed, though dated nine years or more later than the defendant's, had been registered more than a year prior to the defendant's deed. There were questions of fraud involved in the case, in no way material to the point now considered. By the express provisions of the registration act, the plaintiff on the record and face of the papers had the superior right, because his deed had been first registered. Defendant then took the position that though his deed, by virtue of the registration act, was avoided as against plaintiff, yet the same was good as color of title, and proposed to maintain his title by showing Occupation under his unregistered deed for seven years. The Court held that to allow this would be `in effect to destroy chapter 147, Laws 1885, and this we cannot do.' Whatever might be the position of the Court if this were an open question, we think it clear that the principle there announced must be confined to the facts of the case to which it was then applied, and does not extend to a claim by adverse possession held continually for the requisite time under deeds foreign to the true title or entirely independent of the title under which plaintiff makes his claim. As to such deeds and claimants, our present registration law does not, and does not intend to, modify or interfere with the doctrine of maturing title by adverse occupation as heretofore expounded and applied by the decisions of this Court."
The deed being color of title, the evidence of the defendant as to the boundaries of the several tracts described, and of his possession, was competent. *Page 525 
If, however, the defendant claimed under no deed, it was admitted that title was out of the State, and he offered evidence of an adverse possession for more than twenty years. His testimony was not always as specific as might be desired, but when it is remembered (646) that he can do little more than write his name, and that he was stopped every time he attempted to describe his boundaries, it was as definite as could be expected under the circumstances.
It was in evidence that he claimed up to the lines of the 335 acres, and he attempted to describe the lines, saying there were chops and blazes on them; that he had lived on the land sixty-five years and had planted it in corn and cotton, and had worked the turpentine and had cut cross ties; that he and his father had been in possession to the lines he had described, and he offered to prove that when he was a small boy he saw a surveyor run the lines and mark them by chopping and blazing trees and establishing corners covering the 335 acres, which was clearly competent.
As the evidence now stands, the plaintiff has established a prima facie
title, and the defendant is not entitled to the benefit of a common survey provided for in chapter 35 of Battle's Revisal, but he has the right to have his evidence of title by adverse possession, whether with or without color, considered by a jury.
New trial.
Cited: King v. MacRackan, 168 N.C. 624; Buchanan v. Hedden, 169 N.C. 224.